HUGHES, J., DISSENTING: I respectfully dissent because I believe that the majority has failed to follow the United States Supreme Court’s directive in the penultimate paragraph of its decision forcefully reversing the original majority opinion in this case. That directive states: The Kentucky Supreme Court began its opinion by stating that the Wellner power of attorney was insufficiently broad to give Beverly the authority to execute an arbitration agreement for Joe. See supra, at 1425-1426. If that interpretation of the document is wholly independent of the court's clear-statement rule, then nothing we have said disturbs it. But if that rule at all influenced the construction of the Wellner poiver of attorney, then the court must evaluate,the document’s meaning anexa The court’s opinion leaves us uncertain as to whether such an impermissible taint occurred. We therefore vacate the judgment below and return the case to the state court for further consideration. See Marmet Health Care Center, Inc. v. Brown, 565 U.S. 530, 534, 132 S.Ct. 1201, 182 L.Ed.2d 42 (2012) (per curiam) (vacating and remanding another arbitration decision because we could not tell “to what degree [an] alternative holding was influenced by” the state court’s erroneous, arbitration-specific rule). On remand, the court should determine whether it adheres, in the absence of its-clear-statement rule, to its prior reading of the Wellner power of attorney. Kindred Nursing Ctrs, Ltd. Partnership v. Clark, 581 U.S. -, 137 S.Ct. 1421, 1429, 197 L.Ed.2d 806 (2017) (emphasis supplied). Prior to issuing this directive, the Supreme Court noted that this Court had “flouted the FAA’s command to place [arbitration] agreements on an equal footing with all other contracts.” Id. This Court’s distinction between pre-dispute arbitration agreements as not pertaining to a principal’s property rights but rather only his constitutional jury right vis-d-vis post-dispute (or perhaps active dispute) arbitration agreements, which they concede necessarily affect property rights, is simply another attempt to single out arbitration for “hostile” treatment under the guise of Kentucky contract and agency law. An arbitration agreement, regardless of when signed or whether characterized as pre- or post-dispute, has absolutely no reason to exist unless there is a current or potential claim to be pursued or defended against. If there is never a claim, the agreement has no purpose — it just .sits there as an executed • document/contract clause of no real consequence. An arbitration. agreement, whether freestanding ,or part of a broader contract, derives its entire meaning from the fact that the signatories may have or do have a dispute and they agree on the forum for disposing of that claim, whenever it arises. Indeed, the first sentence of the arbitration agreement at'issue (“Arbitration Agreement”) states: Any and all claims or controversies arising out of or in any way relating tó this ADR Agreement (“Agreement”) or the Resident’s stay at the Facility including disputes regarding interpretation Of this Agreement, whether arising out of State or Federal law, whether existing or arising in the future, whether for statutory, compensatory or punitive damages and whether sounding in breach of contract, tort or breach of statutory duties (including, without limitation, any claim based on violation of rights, negligence medical malpractice, any other departure from the accepted standards of health care or safety or the Code of Federal Regulations or unpaid nursing home charges), irrespective of the basis for the duty or of the legal theories upon which the claim is asserted, shall be submitted to alternative dispute resolution as described in this Agreement. The subjects of this first sentence are plainly “claims and controversies.” The particular provision of the Wellner POA that, in my view, authorizes the agent to sign an arbitration agreement, even pre-dispute, is the power “to make, execute and deliver deeds, releases, conveyances and contracts of every nature in relation to both real and personal property, including stocks, bonds, and insurance.” In the original opinion of this Court (“Extendi-care”), the majority noted that property in Kentucky has been broadly construed to include things that are tangible and intangible, visible or invisible, “real or personal, choses in action as well as in possession, everything which has an exchangeable value, or which goes to make up one’s wealth or estate.” 478 S.W.3d at 326 (emphasis in original) citing Commonwealth v. Kentucky Distilleries & Warehouse Co., 143 Ky. 314, 136 S.W.1032, 1037 (1911). The Court acknowledged that a personal injury claim is a chose-in-action and therefore constitutes personal property. Id. at 325-26 citing Button v. Drake, 302 Ky. 517, 195 S.W.2d 66, 69 (1946). The majority then reasoned that, nonetheless, a pre-dispute arbitration agreement is not about property rights but rather constitutional rights. Joe’s personal injury claim was personal property and Beverly had the authority to make contracts relating to it. But the Kindred pre-dispute arbitration agreement was not a contract made “in relation” to a property claim. The agreement did nothing to affect any of Joe’s property or his property rights. The arbitration agreement does not even purport to be a “contract ... in relation to both real and personal property.” As clearly expressed within the agreement itself, the agreement was made in relation to Joe’s constitutional right to access the courts and to trial by jury. Constitutional rights are decisively not “personal property” as we have defined the term. They are not “money, goods, chattels, things in action, and evidences of debt;” nor do they have “an exchangeable value, or which goes to make up one’s wealth or estate.” (Footnote omitted). Id. But, of course, an arbitration agreement is about property rights because without a claim regarding such rights it has no meaning or purpose. See the first sentence of the Arbitration Agreement quoted supra. The majority’s view of arbitration as contrary to the “sacred” right to a jury trial (a point which it continues to emphasize in the current majority) clearly underlies its willingness to divorce an arbitration agreement from the reality of what it is and what it does. An arbitration agreement is plainly a contract “in relation to ... personal property.” The current majority opinion attempts to show its “purity from the taint of anti-arbitration bias” by noting that the Clark POA had “vague and all-encompassing language” and, consequently, the Extendicare majority concluded that Clark’s agent was vested with authority to execute even a pre-dispute arbitration agreement. So, a power “to transact, handle and dispose of all matters affecting me and/or my estate in any possible way” and “generally to do and perform for me in my name all that I might if present” is sufficient. But under the former and current majority’s view a broad power “to make ... contracts of every nature in relation to both real and personal property” is insufficient. This is the exact language from the Wellner POA and so is the following: I hereby further grant unto my Attorney-in-Fact full power in and concerning the above premises and to do any and all acts as set forth above as fully as I could do if I were personally present, and at my decease to pay, transfer and deliver over to my personal representative, all principal and income then in his possession and control, and I do ratify and confirm whatever my said Attorney-in-Fact shall lawfully do under these presents, provided however, that my attorney shall not bind me as surety, guarantor for accommodation nor give away any of my estate, whatsoever, nor shall my attorney be authorized to accept service of process for or on my behalf.... 478 S.W.3d at 319-20.[7] The only response offered to this language, language that is both specific as to contracts of every nature affecting property and broad as to general powers, is the unfounded premise that an arbitration agreement is not about property rights, just the waiver of a constitutional right. Given how that premise ignores the reality of what an arbitration agreement is, why it exists and what it relates to, I firmly believe the analysis of the Wellner POA is impermissibly tainted by the same anti-arbitration bias as the so-called “clear statement rule.” Addressing the clear statement rule in Kindred Nursing Centers, 137 S.Ct. at 1427, the U.S. Supreme Court held that it was “too tailor-made to arbitration agreements ... to survive the FAA’s edict against singling out those contracts for disfavored treatment.” Justice Kagan noted wryly that the Kentucky Constitution protects property rights and speech rights but no one was suggesting that the “broader” constitutional rule adopted by the Ex-tendieare majority would realistically apply to prevent an agent from selling her principal’s furniture or signing a non-disclosure agreement unless those particular constitutional rights were addressed expressly in the POA. Id. The ensuing short passage deserves careful consideration: [T]he [Kentucky Supreme] court hypothesized a slim set of both patently objectionable and utterly fanciful contracts that would be subject to its rule: No longer could a representative lacking explicit authorization waive her “principal’s right to worship freely” or “consent to an arranged marriage” or “bind [her] principal to personal servitude.” Placing arbitration agreements within that class reveals the kind of “hostility to arbitration” that led Congress to enact the FAA. And doing so only makes clear the arbitration-specific character of the rule, much as if it were made applicable to arbitration agreements and black swans. Id. at 1427-28 (citations and footnote omitted). In my view, today’s holding returns to black swan territory by a different route. The narrow focus on the constitutional jury right to the exclusion of the reality of an arbitration agreement returns us to the realm of “utterly fanciful contracts” where arbitration agreements exist in a vacuum independent of disputes and property rights. Arbitration has received its fair share of criticism arid some of it is fully justified but adopting the majority’s artificial distinctions regarding language in POAs is a dangerous way to combat the perceived dangers of arbitration. What happens after the issuance of this majority opinion in the following everyday scenarios? An aging principal let it be known that he did not want to leave his home of forty years, a multi-level residence that cannot accommodate his current needs. His daughter, as agent under his POA, wants to enter into a construction contract to make the needed modifications so he can stay in his home but all the local contractors’ construction contracts have arbitration clauses. Can she sign such an agreement with a pre-dispute arbitration clause? If she does and a dispute arises with the contractor, is the arbitration clause enforceable by either party to the contract? If the arbitration clause is not enforceable, does it invalidate the entire construction contract? The daughter is also looking for around-the-clock care, including the provision of meals, for her father. All the local in-home care agencies require a signed contract. Those -contracts also have arbitration clauses. Can she execute one and, if she does, what happens if there is a dispute as to billing or quality of care? These contracts, for construction and in-home care, were signed pre-dispute and under the majority’s view the arbitration clauses were never about property rjghts but rather solely constitutional rights not covered by the power to “make .., contracts of every nature in relation to both real-and personal property.” So, what happens? Another principal is a shareholder in a closely-held, third generation family business. She, her siblings and several cousins own all the stock. Her son is -agent under her-POA and, due to her incapacity, he has been approached by his aunt and uncle (his mother’s sister and brother) about signing, a voting and buy-sell agreement with them and one of the cousins. They are worried about the direction two out-of-state shareholders (also the principal’s cousins) seem to be charting and they know if they vote together and agree to offer their stock to each other if and when they decide to sell, the company can stay on the track earlier generations intended. Can the son sign the agreement, if it contains an arbitration' clause requiring the signatories to arbitrate any disputes among themselves as to, say, the value of the stock? If he does sign, is it at all .enforceable? Suppose everyone looks the other way at the legality and they proceed to arbitration-. After the principal’s death, can the executor challenge the son’s actions and the arbitration award as not authorized? These scenarios are not even the more likely instances where confusion will occur from the majority’s holding. The principal’s homeowner’s insurance policy needs to be renewed. The principal rents an apartment and her lease is due for renewal. The principal has few assets but unexpectedly receives a sizeable inheritance, so the agent, wants to open an account with a conservative stock brokerage company. All these contracts have arbitration clauses. If the agents execute them, are the contracts themselves invalid or just the arbitration clause? Perhaps the majority would conclude that none of these pose a problem because the arbitration clause is embedded in a “contract in relation to” either real or personal property. If that’s the case, are only freestanding pre-dispute arbitration agreements verboten under the POA? And why is that? The freestanding arbitration agreement, liked the embedded clause, has no purpose other than to identify the forum for the parties to settle disputes about property interests. It is a “contract ... in relation to ... personal property,”[8] ..Additionally, the majority places great emphasis on “pre-dispute” as indicative of the fact that an. arbitration agreement such as the one at issue here is only about constitutional rights. In their view, the “fu-tureness” of the dispute between the parties means that the agreement is not about property at all, just the jury trial right under Section 7 of the Kentucky Constitution. Aside from the repeatedly noted fact about the very, indeed only, reason for an arbitration agreement, where does the emphasis on the futureness of something lead?. When a principal, such as Mr. Well-ner, gives his agent authority under a POA to collect debts, that authority manifestly includes- future debts owed him by others, such as a tenant’s rental payment or a former employer’s final payments under an employment contract or pursuant to a pension plan. The authority to make “contracts of every nature in relation' to both real and personal' property” includes future property of the principal whether a stock dividend, a check for a property insurance claim, an unexpected inheritance or a run-of-the mill refund in a consumer class action. All these future things are encompassed by the POA because that is the nature of the instrument, i.e., to deal with the principal’s affairs in the manner stated whether or not a particular thing, event, type of property was in existence.or even envisioned at the time of the execution of the POA. The majority’s position would presumably respect the agent’s authority in all these future matters but not the future matter of a potential legal claim (a chose in action and therefore personal property) and whether or not to agree to arbitration. • Finally, recent emphasis on arbitration, and its. increasing prevalence in various facets of everyday life, has heightened the bar’s awareness of the need to consider carefully what the principal wishes to authorize the agent to do on that score. Many attorneys now inquire whether the principal wishes for his or her agent to agree to arbitration,- and the POA so states that preference. Going forward, I believe we can expect more clarity in POA instruments regarding the specific preferences of the principal, and that is obviously a desirable result. However, as for the many POAs that are currently in existence we must take them as we find them and construe them in a straightforward manner, not through a lens that disfavors arbitration in violation of the Supremacy Clause and not with artificial distinctions that cannot withstand scrutiny. Because the majority’s construction of the Wellner POA was and is clearly affected, “impermissibl[y] taint[ed],” 137 S.Ct. at 1429, by the same negative view of arbitration that underlay its clear statement rule, we should acknowledge that fact. We must “evaluate the document’s meaning anew” and determine not to “adhere ... to [the] prior reading of the Wellner power of attorney.” Id. For these reasons, I respectfully and strongly dissent. Minton, C.J.; and VanMeter, J., join. . To state the obvious, it would be very difficult for an agent to discern the limits on his or her authority that today’s majority readopts and restates. . Again, in our original Extendicare opinion, the majority acknowledged that a personal injury claim is a chose in action and therefore personal property. 478 S.W.3d at 326. The dissent noted that a chose in action is defined "generally as ‘[a] proprietary- right in persbn-am, such as a debt owed by another person, a share in a joint-stock company, or a claim for damages in tort' and also" as 'the right to bring an action to recover a debt, money or thing.’'' 478 S.W.3d at 348, citing Black’s Law Dictionary, 275 (9th ed. 2009).